[No. S029777. Dec. 9, 1993.]

JORGE RAMIREZ, a Minor, etc., Plaintiff and Appellant, v. PLOUGH, INC., Defendant and Respondent.

COUNSEL

Leonard & Lyde and Robert L. Davis for Plaintiff and Appellant.

Edward M. Chen, Robin S. Toma, Paul L. Hoffman, Mark D. Rosenbaum, Esteban Lizardo, Arthur H. Bryant, Anne W. Bloom, Joseph R. Grodin, Kazan, McClain, Edises & Simon and Dianna Lyons as Amici Curiae on behalf of Plaintiff and Appellant.

Preuss, Walker & Shanagher, Charles F. Preuss, Bronson, Bronson & McKinnon, Kevin G. McCurdy, Jose H. Garcia, Clifford & Warnke, Howrey & Simon, Harold D. Murry, Jr., and Katherine D. McManus for Defendant and Respondent.

Harvey M. Grossman, Daniel F. O'Keefe, Jr., Eve E. Bachrach, Covington & Burling, Bruce N. Kuhlik, Lars Noah, Landels, Ripley & Diamond, Sanford Svetcov and Fred J. Hiestand as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**KENNARD, J.**—We granted review in this case to determine whether a manufacturer of nonprescription drugs may incur tort liability for distributing its products with warnings in English only. Recognizing the importance of uniformity and predictability in this sensitive area of the law, we conclude that the rule for tort liability should conform to state and federal statutory and administrative law. Because both state and federal law now require warnings in English but not in any other language, we further conclude that a manufacturer may not be held liable in tort for failing to label a nonprescription drug with warnings in a language other than English.

I

Plaintiff Jorge Ramirez, a minor, sued defendant Plough, Inc., alleging that he contracted Reye's syndrome as a result of ingesting a nonprescription drug, St. Joseph Aspirin for Children (SJAC), that was manufactured and distributed by defendant. Plaintiff sought compensatory and punitive damages on theories of negligence, products liability, and fraud. The trial court granted summary judgment for defendant. On plaintiff's appeal, the Court of Appeal reversed.

Viewing the appellate record in light of the standard of review for summary judgments (Code Civ. Proc., § 437c; *Molko* v. *Holy Spirit Assn.*

(1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46]), we determine the relevant facts to be these:

In March 1986, when he was less than four months old, plaintiff exhibited symptoms of a cold or similar upper respiratory infection. To relieve these symptoms, plaintiff's mother gave him SJAC. Although the product label stated that the dosage for a child under two years old was "as directed by doctor," plaintiff's mother did not consult a doctor before using SJAC to treat plaintiff's condition. Over a two-day period, plaintiff's mother gave him three SJAC tablets. Then, on March 15, plaintiff's mother took him to a hospital. There, the doctor advised her to administer Dimetapp or Pedialyte (nonprescription medications that do not contain aspirin), but she disregarded the advice and continued to treat plaintiff with SJAC.

Plaintiff thereafter developed Reye's syndrome, resulting in severe neurological damage, including cortical blindness, spastic quadriplegia, and mental retardation.

First described by the Australian pathologist Douglas Reye in 1963, Reye's syndrome occurs in children and teenagers during or while recovering from a mild respiratory tract infection, flu, chicken pox, or other viral illness. The disease is characterized by severe vomiting and irritability or lethargy, which may progress to delirium and coma. In 1982, the Centers for Disease Control estimated that Reye's syndrome affected 600 to 1,200 children and teenagers in this country each year.[1] (47 Fed.Reg. 57886 (Dec. 28, 1982).) The disease is fatal in 20 to 30 percent of cases, with many of the survivors sustaining permanent brain damage. The cause of Reye's syndrome was unknown in 1986 (and apparently remains unknown), but by the early 1980's several studies had shown an association between ingestion of aspirin during a viral illness, such as chicken pox or influenza, and the subsequent development of Reye's syndrome. These studies prompted the United States Food and Drug Administration (FDA) to propose a labeling requirement for aspirin products warning of the dangers of Reye's syndrome. (See 50 Fed.Reg. 51400 (Dec. 17, 1985).) The FDA published a regulation to this effect on March 7, 1986. (51 Fed.Reg. 8180.) Unless extended, the regulation was to expire two years after its effective date. (*Id.* at p. 8182.) In 1988, the FDA revised the required warning to state explicitly that Reye's syndrome is reported to be associated with aspirin use, and it made the regulation permanent. (53 Fed.Reg. 21633 (June 9, 1988).)

Even before the federal regulation became mandatory, packages of SJAC displayed this warning: "Warning: Reye Syndrome is a rare but serious

---

[1]The reported cases of Reye's syndrome in the United States began to decline after 1982, apparently as a result of reduced use of aspirin products by children and teenagers. In 1986, 101 cases of Reye's syndrome were reported. (53 Fed.Reg. 21633, 21634 (June 9, 1988).)

disease which can follow flu or chicken pox in children and teenagers. While the cause of Reye Syndrome is unknown, some reports claim aspirin may increase the risk of developing this disease. Consult doctor before use in children or teenagers with flu or chicken pox." The package insert contained the same warning, together with this statement: "The symptoms of Reye syndrome can include persistent vomiting, sleepiness and lethargy, violent headaches, unusual behavior, including disorientation, combativeness, and delirium. If any of these symptoms occur, especially following chicken pox or flu, call your doctor immediately, even if your child has not taken any medication. REYE SYNDROME IS SERIOUS, SO EARLY DETECTION AND TREATMENT ARE VITAL."

These warnings were printed in English on the label of the SJAC that plaintiff's mother purchased in March 1986. At that time, plaintiff's mother, who was born in Mexico, was literate only in Spanish. Because she could not read English, she was unable to read the warnings on the SJAC label and package insert. Yet she did not ask anyone to translate the label or package insert into Spanish, even though other members of her household could have done so. Plaintiff's mother had never heard, seen, or relied upon any advertising for SJAC in either English or Spanish. In Mexico, she had taken aspirin for headaches, both as a child and as an adult, and a friend had recommended SJAC.

Plaintiff, by and through his mother as guardian ad litem, filed suit against defendant in August 1989, alleging causes of action for fraud, negligence, and product liability, all premised on the theory of failure to warn about the dangers of Reye's syndrome.

The charging allegation as to negligence was that defendant "failed to warn" that aspirin "caused or contributed to the development of Reye's Syndrome in children suffering from the flu, chicken-pox and other viral illnesses." As to fraud, the complaint charged that defendant falsely represented that SJAC "was safe to administer to children with the flu, chicken-pox and other viral illnesses," and that defendant concealed the fact that "aspirin causes or contributes to the development of Reyes [sic] Syndrome in children with the flu, chickenpox or other viral illness." As to products liability, the complaint alleged that the SJAC plaintiff ingested was defective when it left defendant's control and that the product's reasonably foreseeable use involved a substantial and not readily apparent danger of which defendant failed to adequately warn.

Defendant moved for summary judgment, submitting uncontradicted evidence of the facts as stated above. Defendant argued that it was under no

duty to label SJAC with Spanish language warnings, that the English language label warnings were adequate, and that the adequacy of the English warnings was ultimately inconsequential in this case because plaintiff's mother did not read the warnings or have them translated for her. On the motion for summary judgment, the parties agreed that over 148 languages are spoken in the United States. Plaintiff adduced evidence that defendant realized that Hispanics, many of whom have not learned English, constituted an important segment of the market for SJAC, and that defendant had acted on this knowledge by using Spanish language advertisements for SJAC in Los Angeles and New York.[2]

The court granted summary judgment. In its order granting the motion, the court stated that there was "no duty to warn in a foreign language" and no causal relationship between plaintiff's injury and defendant's activities. Plaintiff appealed from the judgment for defendant.

The Court of Appeal reversed. It reasoned that although the question of duty is an issue for the court, the existence of a duty to warn here was undisputed, the actual dispute being as to the adequacy of the warning given. The court noted that the adequacy of a product warning is normally a question of fact, and that a defendant moving for summary judgment has the burden of proving an affirmative defense or the nonexistence of an element of the plaintiff's cause of action. Given the evidence of defendant's knowledge that SJAC was being used by non-English-literate Hispanics, and the lack of evidence as to the costs of Spanish language labeling, the reasonableness of defendant's conduct in not labeling SJAC with a Spanish language warning was, the court concluded, a triable issue of fact.[3]

---

[2]Plaintiff relied on two exhibits, attached to its opposition to defendant's summary judgment motion, to establish that defendant was aware that Hispanics were purchasing SJAC and that defendant had used Spanish language advertising. In its written reply to this opposition, defendant objected to the exhibits as inadmissible hearsay. At the hearing on the motion for summary judgment, plaintiff's counsel requested leave to file a declaration to cure the hearsay problem, but defense counsel in response impliedly withdrew the defense objection by representing that it was unnecessary for the court to rule on the request. The court denied plaintiff's motion for leave to submit a supplemental declaration and granted defendant's motion for summary judgment. Because the court never ruled on defendant's objection to the exhibits, we must assume that the court considered those exhibits when it ruled on the motion for summary judgment. (See Code Civ. Proc., § 437c, subd. (c) ["In determining whether the papers show that there is no triable issue as to any material fact the court shall consider all of the evidence set forth in the papers, except that to which objections have been made and sustained by the court . . . ."]; *Haskell v. Carli* (1987) 195 Cal.App.3d 124, 129-132 [240 Cal.Rptr. 439].)

[3]In its opinion, the Court of Appeal cited and relied upon cases involving the labeling of pesticides and solvents and cases imposing requirements on employers to communicate warnings effectively to non-English-speaking employees. We here consider neither the ques-

II

A

Defendant concedes, as it must, that a manufacturer of nonprescription drugs has a duty to warn purchasers about dangers in its products. For purposes of the summary judgment motion, it also concedes, at least for argument's sake, that it had a duty to warn purchasers of SJAC about the reported association between aspirin use and Reye's syndrome. The issue presented, then, is not the existence of a duty to warn as such, or the class of persons to whom the duty extends, but the nature and scope of the acknowledged duty. Specifically, the issue is whether defendant's duty to warn required it to provide label or package warnings in Spanish. Issues such as this, which concern the scope of an established duty, are resolved by reference to the governing standard of care: "Once the existence of a legal duty is found, it is the further function of the court to determine and formulate the standard of conduct to which the duty requires the defendant to conform." (Rest.2d Torts, § 328B, com. f, p. 153.)

█ The formulation of the standard of care is a question of law for the court. (*Ishmael* v. *Millington* (1966) 241 Cal.App.2d 520, 525 [50 Cal.Rptr. 592]; Rest.2d Torts, § 328B, subd. (c).) Once the court has formulated the standard, its application to the facts of the case is a task for the trier of fact if reasonable minds might differ as to whether the defendant's conduct has conformed to the standard. (*Pool* v. *City of Oakland* (1986) 42 Cal.3d 1051, 1061 [232 Cal.Rptr. 528, 728 P.2d 1163]; *Schwartz* v. *Helms Bakery Limited* (1967) 67 Cal.2d 232, 237-238, fn. 3 [60 Cal.Rptr. 510, 430 P.2d 68]; *Musgrove* v. *Ambrose Properties* (1978) 87 Cal.App.3d 44, 53 [150 Cal.Rptr. 722]; *Slater* v. *Alpha Beta Acme Markets, Inc.* (1975) 44 Cal.App.3d 274, 278 [118 Cal.Rptr. 561, 72 A.L.R.3d 1264]; *Beauchamp* v. *Los Gatos Golf Course* (1969) 273 Cal.App.2d 20, 26-27 [77 Cal.Rptr. 914]; Rest.2d Torts, § 328C, subd. (b); see also, Rest.2d Torts, § 328B, com. g.)

In most cases, courts have fixed no standard of care for tort liability more precise than that of a reasonably prudent person under like circumstances.

---

tion of foreign-language warnings (or the use of symbols or pictorial warnings) for products other than nonprescription drugs, nor the scope of an employer's duty to warn non-English-speaking employees of workplace hazards.

We note also that although symbols and pictograms can be used effectively to warn that a substance is flammable or toxic, or to explain its preparation and use (see 21 C.F.R. § 107.20(b) (1993) [preparation of infant formula]), it is doubtful that they are at present able to convey the more complex warning information typically required for nonprescription drugs. In any event, the issue presented for decision in this case is whether manufacturers must warn in foreign languages, not by means of symbols or pictograms.

(*Greenwood* v. *Summers* (1944) 64 Cal.App.2d 516, 520 [149 P.2d 35]; see also *Warner* v. *Santa Catalina Island Co.* (1955) 44 Cal.2d 310, 317 [282 P.2d 12]; Rest.2d Torts, § 328C, com. (b); Prosser & Keaton on Torts (5th ed. 1984) § 35, pp. 217-219.) "But the proper conduct of a reasonable person under particular situations may become settled by judicial decision or be prescribed by statute or ordinance." (*Satterlee* v. *Orange Glenn School Dist.* (1947) 29 Cal.2d 581, 587 [177 P.2d 279], overruled on other grounds in *Alarid* v. *Vanier* (1958) 50 Cal.2d 617, 624 [327 P.2d 897]; accord, *Barker* v. *Wah Low* (1971) 19 Cal.App.3d 710, 722 [97 Cal.Rptr. 85]; *Beauchamp* v. *Los Gatos Golf Course*, *supra*, 273 Cal.App.2d 20, 26-27; Rest.2d Torts, § 285.)

■ Justice Traynor explained the rationale for using a statute to define the standard of care in the following way: "The significance of a statute in a civil suit for negligence lies in its formulation of a standard of conduct that the court adopts in the determination of such liability. (See Holmes, The Common Law, 120-129; Morris, *The Relation of Criminal Statutes to Tort Liability*, 46 Harv. L. Rev. 453.) The decision as to what the civil standard should be still rests with the court, and the standard formulated by a legislative body in a police regulation or criminal statute becomes the standard to determine civil liability only because the court accepts it. In the absence of such a standard the case goes to the jury, which must determine whether the defendant has acted as a reasonably prudent man would act in similar circumstances. The jury then has the burden of deciding not only what the facts are but what the unformulated standard is of reasonable conduct. When a legislative body has generalized a standard from the experience of the community and prohibits conduct that is likely to cause harm, the court accepts the formulated standards and applies them [citations], except where they would serve to impose liability without fault. [Citations.]" (*Clinkscales* v. *Carver* (1943) 22 Cal.2d 72, 75 [136 P.2d 777]; accord, *Casey* v. *Russell* (1982) 138 Cal.App.3d 379, 383 [188 Cal.Rptr. 18].)

Statutory standards of conduct are commonly invoked by plaintiffs in negligence actions to establish a breach of duty by the defendant. In this setting, proof of the defendant's violation of a statutory standard of conduct raises a presumption of negligence that may be rebutted only by evidence establishing a justification or excuse for the statutory violation. (Evid. Code, § 669; see *Gruss* v. *Coast Transport, Inc.* (1957) 154 Cal.App.2d 85, 88 [315 P.2d 339]; *Lotta* v. *City of Oakland* (1944) 67 Cal.App.2d 411, 413 [154 P.2d 25].)

Less common is the use of a statutory standard of conduct by a defendant to establish that no breach of duty occurred. ■ Courts have generally

not looked with favor upon the use of statutory compliance as a defense to tort liability. The Restatement Second of Torts summarizes the prevailing view in these terms: "Where a statute, ordinance or regulation is found to define a standard of conduct for the purposes of negligence actions, . . . the standard defined is normally a minimum standard, applicable to the ordinary situations contemplated by the legislation. This legislative or administrative minimum does not prevent a finding that a reasonable [person] would have taken additional precautions where the situation is such as to call for them." (Rest.2d Torts, § 288C, com. a, p. 40; see also *Elsworth* v. *Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 547 [208 Cal.Rptr. 874, 691 P.2d 630] [manufacturer's compliance with federal aircraft safety regulations does not preclude liability for defective design]; *Buccery* v. *General Motors Corp.* (1976) 60 Cal.App.3d 533, 540-541 [132 Cal.Rptr. 605] [compliance with federal motor vehicle safety standards does not preclude liability for defective design].)

But there is some room in tort law for a defense of statutory compliance. Where the evidence shows no unusual circumstances, but only the ordinary situation contemplated by the statute or administrative rule, then "the minimum standard prescribed by the legislation or regulation may be accepted by the triers of fact, or by the court as a matter of law, as sufficient for the occasion . . . ." (Rest.2d Torts, § 288C, com. a, p. 40; see also *Arata* v. *Tonegato* (1957) 152 Cal.App.2d 837, 842-843 [314 P.2d 130] [jury entitled to consider compliance with federal labeling requirements for hair dye as factor in determining negligence]; Model U. Product Liability Act, § 108, subd. (A) [compliance with legislative or administrative safety standards relating to product warnings deemed proof that warnings were adequate "unless the claimant proves by a preponderance of the evidence that a reasonably prudent product seller could and would have taken additional precautions"]; see generally, 1 American Law of Products Liability 3d (1987) § 12-8.)

■■■ Here, defendant manufacturer argues, in substance, that the standard of care for packaging and labeling nonprescription drugs, and in particular the necessity or propriety of foreign-language label and package warnings, has been appropriately fixed by the dense layer of state and federal statutes and regulations that control virtually all aspects of the marketing of its products. To evaluate this argument, we proceed to review the applicable statutes and regulations.

B

The federal government regulates the labeling of nonprescription drugs through section 502 of the Food, Drug, and Cosmetic Act (21 U.S.C. § 352),

which provides that a drug shall be considered misbranded if "its labeling is false or misleading in any particular," if any required information "is not prominently placed thereon with such conspicuousness (as compared with other words, statements, designs, or devices, in the labeling) and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use," or if its labeling does not bear "(1) adequate directions for use; and (2) such adequate warnings against use in those pathological conditions or by children where its use may be dangerous to health, or against unsafe dosage or methods or duration of administration or application, in such manner and form, as are necessary for the protection of users . . . ."

The FDA has adopted detailed regulations to implement this federal statute. (21 C.F.R. § 201 et seq. (1993).) Under these regulations, drug labeling must include directions for use (*id.*, § 201.5), a statement of ingredients (*id.*, § 201.10), a statement of identity (*id.*, § 201.61), a declaration of net quantity of contents (*id.*, § 201.62), an explanation of tamper-resistant packaging (*id.*, § 211.132(c)), and indications for use or approved uses (*id.*, § 330.1(c)(2)). In addition to this required information, labeling for nonprescription drugs must contain "warnings against unsafe use, side effects, and adverse reactions in such terms as to render them likely to be read and understood by the ordinary individual, including individuals of low comprehension, under ordinary conditions of purchase and use." (*Id.*, § 330.10(a)(4)(v).)

The FDA regulations specify both the subject matter of required warnings and the actual words to be used. For example, the labeling for aspirin, and for most other over-the-counter drugs, must contain a general warning on use by pregnant or nursing women (" 'As with any drug, if you are pregnant or nursing a baby, seek the advice of a health professional before using this product.' "). (21 C.F.R. § 201.63(a) (1993).) Aspirin products must carry an additional warning against use during the last three months of pregnancy. (*Id.*, § 201.63(e).) Aspirin products must also carry a warning to keep the product out of the reach of children (*id.*, § 201.314(a)) and a warning about Reye's syndrome (*id.*, § 201.314(h)). Still other warnings are required for aspirin products that have been advertised or labeled for use in arthritis or rheumatism. (*Id.*, § 201.314(f).) Finally, nonprescription drug manufacturers must provide any new and further warnings mandated by the terms of "final monographs" issued as FDA regulations. (*Id.*, § 330.10.) Thus, the FDA comprehensively regulates the cautionary labeling of aspirin and other nonprescription medications.

The FDA has stated that it "encourages the preparation of labeling to meet the needs of non-English speaking or special user populations so long as

such labeling fully complies with agency regulations." (53 Fed.Reg. 21633, 21636 (June 9, 1988).) But the controlling regulation requires only that manufacturers provide full English labeling for all nonprescription drugs except those "distributed solely in the Commonwealth of Puerto Rico or in a Territory where the predominant language is one other than English . . . ." (21 C.F.R. § 201.15(c)(1) (1993).) The regulation further states that if the label or packaging of any drug distributed in the 50 states contains "any representation in a foreign language,"[4] then all required "words, statements, and other information" must appear in the foreign language as well as in English. (*Id.*, § 201.15(c)(2)-(3).) Finally, the regulation states that "use of label space for any representation in a foreign language" is not a basis to exempt a manufacturer from the general obligation to make required language prominent and conspicuous. (21 C.F.R. § 201.15(b)(3) (1993).)

California law parallels and reinforces federal law on the points discussed here. The Health and Safety Code mandates conspicuous English language warnings in section 25900, which provides: "Cautionary statements which are required by law, or regulations adopted pursuant to law, to be printed upon the labels of containers in which dangerous drugs, poisons, and other harmful substances are packaged shall be printed in the English language in a conspicuous place in type of conspicuous size in contrast to the typography, layout, or color of the other printed matter on the label." (See also *id.*, §§ 26633, 26637.5.) Although warnings in English are expressly required, no California statute requires label or package warnings in any other language.

## C

Defining the circumstances under which warnings or other information should be provided in a language other than English is a task for which legislative and administrative bodies are particularly well-suited. Indeed, the California Legislature has already performed this task in a variety of different contexts, enacting laws to ensure that California residents are not denied important services or exploited because they lack proficiency in English.

Many of these laws impose duties on government agencies to hire bilingual employees for public contact positions and to provide forms, pamphlets, and other written materials in languages other than English. (E.g., Gov. Code, § 7290 et seq. [state agencies in general]; Lab. Code, § 105 [Dept. of

---

[4]It is unclear what constitutes a "representation" within the meaning of this regulation. If the term includes only factual representations about the uses or effectiveness of the product, then some abbreviated warnings (such as, "If you do not read English, ask someone to translate this label for you before using this product") in a foreign language might not violate the regulation.

Labor Stds. Enforcement]; Unemp. Ins. Code, § 316 [unemployment compensation]; Welf. & Inst. Code, § 19013.5 [Dept. of Rehabilitation]; *id.*, § 10607 [Dept. of Social Services]; see also, Gov. Code, § 53112 [emergency telephone systems].) Some require Spanish or other foreign-language versions of particular government documents. (E.g., Civ. Code, § 4556 [brochure describing summary dissolution of marriage]; Code Civ. Proc., § 412.20 [summons]; *id.*, § 681.030 [forms for enforcement of judgment]; Elec. Code, § 10012 [ballot statements of candidates for local office]; *id.*, §§ 14005, 14203 [ballots]; Food & Agr. Code, § 5777 [notice of aerial spraying of pesticide]; Health & Saf. Code, § 1113 [family planning pamphlets]; *id.*, § 1599.74 ["bill of rights" for nursing home patients]; Rev. & Tax. Code, § 255.8 [property tax exemption applications and instructions]; Veh. Code, § 1656 [synopsis of Veh. Code]; Welf. & Inst. Code, § 14191 [sterilization consent form]; *id.*, § 18915 [food stamps application].) Others address the language needs of parties to judicial and administrative proceedings. (E.g., Code Civ. Proc., § 116.550 [interpreters in judicial proceedings]; Evid. Code, § 750 et seq. [same]; Gov. Code, § 11513, subd. (d) [interpreters in administrative proceedings].)

In another category are laws imposing duties on parties engaged in private commercial transactions to furnish information in a language other than English under specified conditions. (E.g., Civ. Code, § 1632 [various enumerated business contracts]; *id.*, § 1689.7 [home solicitation contracts]; *id.*, § 1799.91 [consumer credit contracts]; *id.*, § 2945.3 [mortgage foreclosure consulting contracts]; *id.*, § 2924c [notices of default under mortgage or deed of trust]; Bus. & Prof. Code, § 9998.2 [foreign labor contracts]; *id.*, § 17539.6 [advertisements containing 900 numbers]; Gov. Code, § 8219.5 [advertisements by notaries public]; Lab. Code, § 1695 [farm labor contractors].)

In defining the circumstances under which a foreign language must be used, the Legislature has drawn clear lines so that affected persons and entities, in both the private and public spheres, know exactly what is expected of them. In some instances, the Legislature has limited its mandate to the English and Spanish languages. (See, e.g., Lab. Code, § 1695 [compensation disclosure for farm labor contractors]; Rev. & Tax. Code, § 255.8 [property tax exemption claim forms]; Veh. Code, § 1656 [Veh. Code summaries].) When the Legislature has extended a mandate to languages other than English and Spanish, it has provided a means to determine which languages are included. Often, the Legislature has used a numerical threshold of affected or potentially affected persons speaking a given language to define the scope of the relevant duty to provide information in that language. (E.g., Elec. Code, § 14203 [3 percent]; Food & Agr. Code,

§ 5777 [5 percent]; Gov. Code, § 7296.2 [same]; *id.*, § 53112 [same]; Health & Saf. Code, § 1113 [10 percent]; *id.*, § 1599.74 [1 percent]; Rev. & Tax. Code, § 255.8 [10 percent].) In other instances, the statute requires that a person who used a foreign language for an advertisement, sales presentation, contract negotiations, or similar purpose must continue to use that language in written agreements and disclosures. (E.g., Civ. Code, § 2945.3 [contract with mortgage foreclosure consultant to be "in the same language as principally used by the foreclosure consultant to describe his services or to negotiate the contract"]; *id.*, § 1689.7 [home solicitation contracts to be in language "principally used in the oral sales presentation"]; Gov. Code, § 8219.5 [advertisement by notary public in language other than English shall include fee schedule and statement that notary is not an attorney and cannot give legal advice].)

These statutes demonstrate that the Legislature is able and willing to define the circumstances in which foreign-language communications should be mandated. Given the existence of a statute expressly requiring that package warnings on nonprescription drugs be in English, we think it reasonable to infer that the Legislature has deliberately chosen not to require that manufacturers also include warnings in foreign languages. The same inference is warranted on the federal level. The FDA's regulations abundantly demonstrate its sensitivity to the issue of foreign-language labeling, and yet the FDA regulations do not require it. Presumably, the FDA has concluded that despite the obvious advantages of multilingual package warnings, the associated problems and costs are such that at present warnings should be mandated only in English.

On this point, the FDA's experience with foreign-language patient package inserts for prescription drugs is instructive. Recognizing that "the United States is too heterogeneous to enable manufacturers, at reasonable cost and with reasonable simplicity, to determine exactly where to provide alternative language inserts," the FDA for a time required manufacturers, as an alternative to multilingual or bilingual inserts, to provide Spanish language translations of their patient package inserts *on request* to doctors and pharmacists. (45 Fed.Reg. 60754, 60770 (Sept. 12, 1980).) But the FDA later noted that manufacturers were having difficulty obtaining accurate translations (46 Fed.Reg. 160, 163 (Jan. 2, 1981)), and eventually it abandoned altogether the patient-package insert requirement for prescription drugs (47 Fed.Reg. 39147 (Sept. 7, 1982)).

Were we to reject the applicable statutes and regulations as the proper standard of care, there would be two courses of action open to us. The first would be to leave the issue for resolution on a case-by-case basis by

different triers of fact under the usual "reasonable person" standard of care. This was the approach that the Court of Appeal adopted in this case. As a practical matter, such an open-ended rule would likely compel manufacturers to package all their nonprescription drugs with inserts containing warnings in multiple foreign languages because, simply as a matter of foreseeability, it is foreseeable that eventually each nonprescription drug will be purchased by a non-English-speaking resident or foreign tourist proficient only in one of these languages. The burden of including warnings in so many different languages would be onerous, would add to the costs and environmental burdens of the packaging, and at some point might prove ineffective or even counterproductive if the warning inserts became so large and cumbersome that a user could not easily find the warning in his or her own language.

The other alternative would be to use our seldom-exercised power to judicially declare a particularized standard of care, giving precise guidance on this issue. But this determination would involve matters that are peculiarly susceptible to legislative and administrative investigation and determination, based upon empirical data and consideration of the viewpoints of all interested parties. A legislative body considering the utility of foreign-language label warnings for nonprescription medications would no doubt gather pertinent data on a variety of subjects, including the space limitations on nonprescription drug labels and packages, the volume of information that must be conveyed, the relative risks posed by the misuse of particular medications, the cost to the manufacturer of translating and printing warnings in languages other than English, the cost to the consumer of multilingual package warnings in terms of higher prices for, or reduced availability of, products, the feasibility of targeted distribution of products with bilingual or multilingual packaging, the number of persons likely to benefit from warnings in a particular language, and the extent to which nonprescription drug manufacturers as a group have used foreign-language advertisements to promote sales of their products. Legislation and regulations would no doubt reflect findings on these and other pertinent questions.

Lacking the procedure and the resources to conduct the relevant inquiries, we conclude that the prudent course is to adopt for tort purposes the existing legislative and administrative standard of care on this issue. The feasibility and advisability of foreign-language labeling for nonprescription drugs will, no doubt, be reviewed periodically by the FDA and other concerned agencies. Indeed, we are conscious that our decision here may prompt review of this issue by the California Legislature. That is as it should be, for further study might persuade the Legislature, the FDA, or any other concerned agency to revise the controlling statutes or regulations for nonprescription drugs.

Plaintiff and the amici curiae ("friends of the court") who have submitted briefs on plaintiff's behalf offer various arguments in support of a rule that would permit juries to award tort damages for a manufacturer's failure to provide foreign-language labeling for nonprescription drugs. None of these arguments is persuasive.

Amici curiae argue, first, that the right of persons accused of crime to the services of an interpreter (see Cal. Const., art. I, § 14; *People* v. *Rodriguez* (1986) 42 Cal.3d 1005, 1010 [232 Cal.Rptr. 132, 728 P.2d 202]) demonstrates the existence of a general legal obligation to accommodate the needs of persons not proficient in English. But the situation of a person accused of crime is not at all comparable to that of a purchaser or user of a nonprescription drug. Due process considerations are at their most urgent in criminal prosecutions because the entire weight of the state's prosecutorial resources is arrayed against the accused, who faces possible loss of liberty. In addition, the accused's access to normal sources of language assistance—friends, family, and community organizations—is severely restricted during proceedings within a courtroom. The right to an interpreter assures that these normal courtroom restrictions do not disadvantage those criminally accused who are unable to understand English. Finally, and most fundamentally, a court trying a criminal case can readily determine and meet the linguistic needs of each individual accused without engaging in the complex balance of advantages and costs required to set an industry-wide standard to meet the diverse linguistic needs of the large, heterogeneous population of potential users of mass-marketed products.

Next, plaintiff's amici curiae suggest that a judicially declared rule could appropriately circumscribe the scope of a nonprescription drug manufacturer's duty to warn in a foreign language by requiring warnings only in languages in which the manufacturer had advertised its product. The requirement is surely appropriate at least in this situation, amici argue, because defendant's use of foreign-language advertising demonstrates its knowledge that persons understanding only that language are likely to buy its products, and because it is morally blameworthy to advertise a product in a foreign language without also conveying necessary warnings in that same language.

As we have seen, the Legislature has adopted a similar approach in other contexts, requiring that one who advertises, negotiates, or makes an oral sales presentation in a foreign language must also provide a written contract or make other disclosure in the same language. But the existence of these statutes only underscores the point that the Legislature and concerned administrative agencies are able to provide the appropriate forum to consider the arguments for multilingual warnings.

We do not, of course, foreclose the possibility of tort liability premised upon the *content* of foreign-language advertising. For example, we do not decide whether a manufacturer would be liable to a consumer who detrimentally relied upon foreign-language advertising that was materially misleading as to product risks and who was unable to read English language package warnings that accurately described the risks. No such issue is presented here. Although plaintiff presented evidence that defendant advertised its product in Spanish, the record contains no evidence of the content of that advertising. And, in any event, plaintiff's mother could not have relied upon defendant's advertising because she admittedly did not see or hear it.

For these reasons, we reject plaintiff's attempt to place on nonprescription drug manufacturers a duty to warn that is broader in scope and more onerous than that currently imposed by applicable statutes and regulations. The FDA has stressed that "it is in the best interest of the consumer, industry, and the marketplace to have uniformity in presentation and clarity of message" in the warnings provided with nonprescription drugs. (50 Fed.Reg. 51400, 51402 (Dec. 17, 1985); see also, 51 Fed.Reg. 16258, 16260 (May 1, 1986).) To preserve that uniformity and clarity, to avoid adverse impacts upon the warning requirements mandated by the federal regulatory scheme, and in deference to the superior technical and procedural lawmaking resources of legislative and administrative bodies, we adopt the legislative/regulatory standard of care that mandates nonprescription drug package warnings in English only.

## III

Plaintiff contends that defendant should be held liable for his injuries even if, as we have concluded, defendant was not required to include Spanish language warnings with SJAC. Plaintiff insists there are other bases of liability that are within the scope of the complaint and that were raised in both the trial court and the Court of Appeal.

The first alternative ground of liability is an alleged defect in the English language labeling. Plaintiff maintains that the product label represented that SJAC was safe to administer to a child suffering from a common cold. Plaintiff argues that because a cold is a viral illness, and because Reye's syndrome is associated with aspirin use during or while recovering from viral illnesses, defendant should have warned against the use of SJAC for children experiencing or recovering from the symptoms of the common cold.

The evidence submitted on the motion for summary judgment precludes liability on this ground. Plaintiff's mother, who administered the SJAC to

plaintiff, neither read nor obtained translation of the product labeling. Thus, there is no conceivable causal connection between the representations or omissions that accompanied the product and plaintiff's injury.

■ The other alternative ground of liability is that defendant should not have marketed SJAC at all because the risks of Reye's syndrome clearly outweighed any benefit to be derived from the product, particularly in light of the availability of nonaspirin pain relievers. We conclude, however, as a matter of law, that defendant may not be held liable for failing to withdraw its product from the market in early 1986, when plaintiff's mother purchased and used it. (Defendant did cease distribution of SJAC effective December 31, 1986.) Although devastating, Reye's syndrome was then and remains now a rare and poorly understood illness. A few scientific studies had shown an association between aspirin and Reye's syndrome, but the methodology of those studies had been questioned and the FDA had determined that further studies were needed to confirm or disprove the association. Pending completion of those studies, the FDA concluded that product warnings were an adequate public safety measure. Although the FDA's conclusion is not binding on us, we think it deserves serious consideration. Plaintiff has submitted nothing that causes us to doubt the FDA's judgment in this matter that in early 1986 aspirin could be considered a reasonably safe product for administration to children, when distributed with appropriate warnings.

IV

We recognize that if a Spanish language warning had accompanied defendant's product, and if plaintiff's mother had read and heeded the warning, the tragic blighting of a young and innocent life that occurred in this case might not have occurred. Yet, as one court has aptly commented, "The extent to which special consideration should be given to persons who have difficulty with the English language is a matter of public policy for consideration by the appropriate legislative bodies and not by the Courts." (*Carmona* v. *Sheffield* (N.D.Cal. 1971) 325 F.Supp. 1341, 1342, affd. *per curiam* (9th Cir. 1973) 475 F.2d 738.) ■ We hold only that, given the inherent limitations of the judicial process, manufacturers of nonprescription drugs have no presently existing legal duty, within the tort law system, to include foreign-language warnings with their packaging materials.

The judgment of the Court of Appeal is reversed with directions to affirm the summary judgment for defendant.

Lucas, C. J., Panelli, J., Arabian, J., Baxter, J., and George, J., concurred.

MOSK, J.—I concur. I write separately to emphasize the majority's caveat that "We do not . . . foreclose the possibility of tort liability premised upon

the *content* of foreign-language advertising. For example, we do not decide whether a manufacturer would be liable to a consumer who detrimentally relied upon foreign-language advertising that was materially misleading as to product risks and who was unable to read English language package warnings that accurately described the risks. No such issue is presented here. . . ." (Maj. opn., *ante*, p. 555.) The issue is not presented because the court implicitly refused to consider any possible evidence of advertising in Spanish in ruling on the summary judgment motion. (Cf. maj. opn., *ante*, pp. 545-546, fn. 2.) The record suggests the court's implicit refusal was premised on defense objections that the evidence was hearsay and was not properly authenticated.

With regard to relevance, however, no objection could properly have been sustained. Evidence of the content, timing, duration, and scope of distribution of foreign-language advertising bears substantially on the question whether a non-English-literate consumer has been materially misled about product risks, and a trial court must consider that evidence if properly presented.

The majority do not define "materially misleading as to product risks," leaving that issue for another day—a day likely to arrive soon, given the high probability that foreign-language media will continue to expand in California.

Popular advertisements for over-the-counter drugs generally emphasize their therapeutic effects, not the harmful or fatal consequences of inadvertent misuse. Yet the proper use and inadvertent misuse of drugs occur in very similar ways: swallowing one pill may prove therapeutic, but more may be fatal. Hence, a foreign-language pharmaceutical advertisement will be "materially misleading as to product risks" if a company extolls a drug's health benefits in the advertisement yet does not warn a non-English-literate consumer of the risks of misuse in a manner reasonably calculated to reach that consumer before the product is consumed or applied.

If there is such a misrepresentation, then a jury ordinarily should decide the defendant's tort liability. (See generally *Stanley Industries, Inc.* v. *W.M. Barr & Co., Inc.* (S.D. Fla. 1992) 784 F.Supp. 1570.)

To conclude that notice must be reasonably calculated to reach the non-English-literate consumer is not necessarily to decide that the foreign-language warning must appear in or on the promotional material itself, or on the product's warning label. Notice on a drug's product label, in the foreign languages in which the drug is advertised, not to take or apply the drug

before reading a package insert's detailed warning in those languages may, depending on the facts, be sufficient to warn of hazards and yet satisfy federal law. (See maj. opn., *ante*, p. 550, fn. 4.) In general, I believe that as long as an over-the-counter drug manufacturer gives reasonable notice, by any legal means, of possible side effects in a foreign language to a non-English-literate consumer whose purchase has been induced in that language, it has met the standard of conduct California tort law demands.

Appellant's petition for a rehearing was denied February 24, 1994.