Filed 12/3/18; Opinion on remand from Supreme Court
Reposted 12/4/18 with correct file date & caption
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al., | B259424 |
| Petitioners, | (Los Angeles County Super. Ct. No. SC108504) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| KATHERINE ROSEN, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS in mandate. Gerald Rosenberg, Judge. Petition for writ of mandate granted in part.

Maranga Morgenstern, Kenneth A. Maranga, Paul A. Elkhort, Morgan A. Metzger and Dennis Newitt; Greines, Martin, Stein & Richland, Timothy T. Coates and Feris M. Greenberger; University of California Office of the General Counsel, Charles F. Robinson, Karen J. Petrulakis and Normal J. Hamill; University of California, Los Angeles and Kevin S. Reed for Petitioners.

Reed Smith, Paul D. Fogel and Dennis Peter Maio for The California Community Colleges, California Institute of Technology, California State University, Chapman University, Claremont McKenna College, Pepperdine University, Pitzer College, Pomona College, Stanford University and The University of Southern California, as amici curiae on behalf of Petitioners.

Munger, Tolles & Olson, Brad S. Phillips and Grant Davis-Denny for JED Foundation, American College Counseling Association and NASPA: Student Affairs Administrators in Higher Education, as amici curiae on behalf of Petitioners.

No appearance for Respondent.

Alan Charles Dell'Ario; Panish, Shea & Boyle, Brian Panish and Deborah S. Chang for Real Party in Interest.

The Arkin Law Firm and Sharon J. Arkin for Consumer Attorneys of California, as amicus curiae on behalf of Real Party in Interest.

_____

Katherine Rosen, a student at the University of California at Los Angeles, was severely injured after being attacked by another student who had been receiving treatment for mental illness. Rosen filed a negligence action alleging that university personnel failed to take reasonable measures to protect her from the perpetrator's foreseeable violent conduct. Defendants moved for summary judgment, arguing that postsecondary schools do not have a duty to protect their students from third-party misconduct. The trial court denied the motion, finding that the defendants owed Rosen a duty of care, and that triable issues of fact existed whether they had breached that duty.

The defendants challenged the order through a petition for writ of mandate. A divided panel of this court granted the

petition based on a finding of no duty. In *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607 (*Regents*), the Supreme Court reversed our decision, holding that colleges and universities have a "duty to use reasonable care to protect their students from foreseeable acts of violence in the classroom or during curricular activities." (*Id.* at p. 627.) The Court remanded the case to resolve several issues the majority did not address in our initial opinion.

We now deny defendants' petition for writ of mandate, except with respect to defendant Nicole Green, concluding that: (1) the standard of care governing a university's duty to protect its students from foreseeable acts of violence is the ordinary reasonable person standard; (2) triable issues of fact exist whether the defendants breached their duty of care to Rosen; and (3) although Civil Code section 43.92 precludes liability against defendant Nicole Green, the remaining defendants are not statutorily immune from suit.

## FACTUAL BACKGROUND
### A. *Summary of the Incident and Rosen's Claim*

Damon Thompson enrolled in the University of California at Los Angeles (UCLA) in the fall of 2008.[1] Shortly after arriving on campus, he began to experience auditory hallucinations and paranoid thinking. Thompson informed multiple administrators, professors, teaching assistants and dorm personnel that other students in his classroom and dormitory were making offensive

---

[1] We provide a more detailed description of the events that preceded Thompson's attack on Rosen, and the evidence the parties submitted at the summary judgment proceedings, in our analysis of whether there is a triable issue of fact regarding defendants' breach of their duty.

3

remarks to him, and trying to disrupt his work. In February of 2009, Thompson was transported to a hospital for a psychiatric evaluation after claiming that he had heard other students in his dormitory plotting to shoot him. He was diagnosed with possible schizophrenia, and began receiving mental treatment through the university.

Over the next several months, university personnel monitored Thompson, who continued to accuse other students of insulting him and to engage in other erratic behavior, which included repeatedly shoving a student for making too much noise. Immediately after the fall semester began in 2009, Thompson complained to his chemistry professor and teaching assistant that other students in his chemistry laboratory were calling him stupid. The professor informed school administrators of Thompson's behavior, and requested advice on how to respond. On October 8, 2009, Thompson was working in the chemistry laboratory when he suddenly attacked fellow student Katherine Rosen with a kitchen knife. Rosen survived the attack, but sustained serious, life-threatening injuries.

Rosen filed a tort action against the Regents of the University of California and several UCLA employees who had knowledge of Thompson's mental condition.[2] The complaint

---

[2] Although public entities are generally not liable for injuries they cause, the Government Claims Act provides specific, limited exceptions to this general rule. Rosen's negligence claim against the Regents is based on an exception set forth in Government Code section 815.2, subdivision (a), which imposes vicarious liability on a public entity for its employees' wrongful conduct. Rosen alleges that the university employees she has named as defendants, which includes Dean of Students Robert Naples, Associate Dean of Students Cary Porter, Professor Alfred Bacher

4

alleged a single cause of action for negligence asserting that universities and their employees have a duty to protect their students from foreseeable acts of violence. The complaint further alleged defendants had breached their duty of care because they knew of Thompson's "dangerous and violent propensities," but failed to adopt reasonable measures to protect Rosen.

### B. *Procedural History*
#### 1. *Defendants' motion for summary judgment and petition for writ of mandate*

The defendants filed a motion for summary judgment arguing that Rosen's claim failed for three reasons. First, they argued that colleges and universities do not have a duty to protect their students from criminal conduct perpetrated by other students. Second, defendants contended that even if universities have such a duty, the undisputed evidence showed UCLA and its personnel had acted reasonably in addressing the threat Thompson posed to other students, and that his attack was not a foreseeable event. Third, defendants argued they were statutorily immune from Rosen's claim under Government Code sections 856 and 820.2, and Civil Code section 43.92.

In her opposition, Rosen argued that colleges and universities have a special relationship with their students that gives rise to a duty to protect them from foreseeable acts of

---

and UCLA psychologist Nicole Green, as well as other UCLA employees, breached their duty to protect her from foreseeable threats of violence, and that the Regents is likewise liable under the doctrine of respondeat superior.

5

violence in the classroom.[3]  Rosen further asserted that there were triable issues of fact whether the defendants had breached this duty.  In support, Rosen provided declarations from two expert witnesses stating that the university should have conducted a formal threat assessment on Thompson, and required that he participate in meaningful psychiatric treatment as a condition of his continued attendance.  The experts further concluded that the university's failure to undertake such precautions violated UCLA's "own policies and procedures and the standard applicable to all universities."  Finally, Rosen argued that none of the statutes the defendants had identified in their motion immunized them from her claim.

The trial court denied the motion, finding that universities owe a duty to protect their students under the special relationship doctrine, and that the defendants were not immune from suit.  The court also found that triable issues of fact existed as to whether defendants had breached their duty to protect Rosen.

The defendants challenged the trial court's order in a petition for writ of mandate.  A divided panel of this court granted the petition, the majority holding that universities do not have a duty to warn or protect students from third-party criminal

---

[3]    Rosen raised additional theories of duty based on an implied-in-fact contract, the negligent undertaking doctrine and UCLA's status as the property owner.  The Supreme Court, however, concluded that because the university owed a duty to protect its students based on the special-relationship doctrine, it need not address any possible alternative source of duty. (*Regents*, *supra*, 4 Cal.5th at p. 634, fn. 8.)

conduct.[4]  Having concluded that the university did not have a duty to protect Rosen, the majority did not address whether the school and its employees were statutorily immune under Government Code section 856 and 820.2, nor did it address whether there was a disputed issue of material fact regarding breach of the duty.

The dissent, however, would have found colleges and universities owe a duty to protect students from foreseeable violent pursuant to the special-relationship doctrine.  The dissent additionally concluded that the defendants were not immune from suit,[5] and that there were triable issues of fact whether the university had breached its duty of care.

### 2. *Regents of University of California v. Superior Court*

In *Regents of University of California v. Superior Court, supra,* 4 Cal.5th 607, the Supreme Court held that "[colleges] and

---

**4**      As discussed in more detail below, the majority additionally held that Civil Code section 43.92 precluded liability against defendant Nicole Green, a university therapist who had treated Thompson, because there was no evidence Thompson had ever communicated a serious threat of physical violence against an identifiable victim.  (See Civil Code, § 43.92, subd. (a) [precluding claims against "a psychotherapist . . . [for] failing to protect from a patient's threatened violent behavior  . . .  except if the patient has communicated to the psychotherapist a serious threat of physical violence against a reasonably identifiable victim or victim"].)

**5**      The dissent agreed with the majority's finding that Civil Code section 43.92 precluded liability against defendant Nicole Green (see *ante*, fn. 4), but concluded that none of the remaining defendants were statutorily immune.

7

universities[6] have a special relationship with their students" (*id.* at p. 614), and "a duty to use reasonable care to protect [them] from foreseeable acts of violence in the classroom or during curricular activities."[7] (*Id.* at p. 627.) The Court concluded that the special relationship arose from "the unique features of the college environment" (*id.* at p. 624), explaining: "While [a university's] primary function is to foster intellectual development through an academic curriculum, the institution is involved in all aspects of student life. Through its providing of food, housing, security, and a range of extracurricular activities the modern university provides a setting in which every aspect of student life is, to some degree, university guided.' [Citation.]" (*Id.* at p. 625.) As a result of these attributes, "colleges have a superior ability to provide . . . safety with respect to activities they sponsor or facilities they control." (*Ibid.*)

The Court further concluded, however, that "many aspects of a modern college student's life are, quite properly, beyond the institution's control," including "how students behave off campus, or in their social activities unrelated to school." (*Regents, supra,* 4 Cal.5th at p. 626.) To accommodate these concerns, the Court

---

**6** The Court explained in a footnote that it used "the terms 'college' and 'university' interchangeably to refer to all schools that provide postsecondary education to enrolled students." (*Regents, supra,* 4 Cal.5th at p. 614, fn. 1.) We do the same.

**7** In a footnote, the Court clarified that although its decision "speak[s] . . . of a university's duty 'to protect' its students from foreseeable harm. . . ., [i]n an appropriate case, this duty may be fully discharged if adequate *warnings* are conveyed to the students at risk." (*Regents, supra,* 4 Cal.5th at p. 619, fn. 3 [emphasis in original].)

limited the special relationship between universities and their students "to activities that are tied to the school's curriculum but not to student behavior over which the university has no significant degree of control." (*Id*. at p. 627.) The Court concluded that in this case, it was clear Rosen had been injured during a curricular activity – "in a chemistry laboratory while class was in session." (*Ibid*.)

The Court noted that its "recognition of a special relationship" between universities and their students was consistent with "decisions from other states" (*Regents, supra,* 4 Cal.5th at pp. 626-627 [citing and discussing *Mullins v. Pine Manor College* (1983) 389 Mass. 47 (*Mullins*), *Nova Southeastern University v. Gross* (Fla. 2000) 758 So.2d 86 (*Nova*) and *Furek v. University of Delaware* (Del. 1991) 594 A.2d 506 (*Furek*)]), as well as the Restatement Third of Torts. (*Regents, supra,* 4 Cal.5th at p. 620 [citing Rest.3d Torts, Liability for Physical and Emotional Harm, § 40, subd. (b) (Rest.3d) [identifying "a school with its students" as a form of "special relationship[] that may support a duty to protect against foreseeable risks"]].) The Court emphasized, however, that the comments to the Restatement further observe that "reasonable care varies in different school environments, with substantially different supervision being appropriate in elementary schools as opposed to colleges." (*Regents, supra,* 4 Cal.5th at p. 620 [citing Rest.3d, § 40, com. l, p. 45].)

Having found that universities owe a duty to protect their students from foreseeable harm under the special-relationship doctrine, the Court next considered whether any of the "policy considerations" set forth in *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*) "justified excusing or limiting [a

9

university's] duty of care." (*Regents, supra,* 4 Cal.5th at p. 628.) On the issue of foreseeability (see *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1145 ["[t]he most important factor to consider in determining whether to create an exception to [duty under *Rowland*] . . . is whether the injury in question was foreseeable"), the Court explained that although "comparatively rare[,] [a] classroom attack is a foreseeable occurrence that colleges have been equipping themselves to address for at least the past decade." (*Regents, supra,* 4 Cal.5th at p. 629.)

The Court clarified that for purposes of determining the existence of a duty, "the question [was] not whether [the university] could [have] predict[ed] that [Thompson] would stab [Rosen][,] . . . [but rather] whether a reasonable university could foresee that its negligent failure to control a potentially violent student . . . could result in harm to . . . students," adding: "Whether a university was, or should have been, on notice that a particular student posed a foreseeable risk of violence is a case-specific question, to be examined in light of all the surrounding circumstances. Any prior threats or acts of violence by the student would be relevant, particularly if targeted at an identifiable victim. [Citation.] Other relevant facts could include the opinions of examining mental health professionals, or observations of students, faculty, family members, and others in the university community. Such case-specific foreseeability questions are relevant in determining the applicable standard of care or breach in a particular case. They do not, however, inform our threshold determination that a duty exists." (*Regents, supra,* 4 Cal.5th at pp. 629-630.)

The Court next addressed whether any "public policy concerns" weighed in favor of excusing or limiting universities'

10

duty of care. (*Regents, supra,* 4 Cal.5th at p. 629.) The Court rejected defendants' assertion that imposing a duty to protect students from foreseeable acts of violence "would discourage colleges from offering comprehensive mental health and crisis management services," and create "incentive[s] to expel anyone who might pose a remote threat to others." (*Id.* at p. 632.) The Court explained: "We understand that . . . [t]he existence of a duty may give some schools a marginal incentive to suspend or expel students who display a potential for violence. It might make schools reluctant to admit certain students, or to offer mental health treatment. But colleges' decisions in this area are restricted to some extent by laws such as the Americans with Disabilities Act [citation]. In addition . . . market forces . . . would likely weigh against the dismantling of these protections." (*Ibid.*)

The Court also rejected defendants' argument that imposing a duty to protect would be "prohibitively expensive and impractical[,] . . . [effectively requiring] university professors and administrators [to become] the 'insurers' of student safety." (*Regents, supra,* 4 Cal.5th at p. 633.) The Court explained that the record showed "UCLA, like other colleges across the country, ha[d] already developed sophisticated strategies for identifying and defusing potential threats to student safety," which included "multidisciplinary teams of trained staff members and professionals." (*Ibid.*) According to the Court, because "colleges have already focused considerable attention on identifying and responding to potential threats . . ., it does not appear that recognizing a legal duty to protect students from foreseeable threats would pose an unmanageable burden." (*Ibid.*)

11

The Court also emphasized that it was not charging universities with a "broad duty to prevent violence against the students." (*Regents, supra,* 4 Cal.5th at p. 633.) Rather, as stated by the Court, "[w]e simply hold that they have a duty to act with reasonable care when aware of a foreseeable threat of violence in a curricular setting. Reasonable care will vary under the circumstances of each case. Moreover, some assaults may be unavoidable despite a college's best efforts to prevent them. Courts and juries should be cautioned to avoid judging liability based on hindsight." (*Id.* at p. 634; see also *id.* at p. 633 ["the school's duty is to take *reasonable* steps to protect students when it becomes aware of a *foreseeable* threat to their safety. The reasonableness of a school's actions in response to a potential threat is a question of breach"] [emphasis in original].)

Having concluded the university had a duty to protect Rosen from foreseeable acts of violence, the Court remanded the case to address two additional issues defendants had raised in their petition for writ of mandate: (1) whether the parties' evidence establishes as a matter of law that defendants did not breach their duty of care; and (2) whether various provisions of the Government and Civil Codes shield UCLA and its employees from liability. (*Regents, supra,* 4 Cal.5th at p. 634.) On the question of breach, the Court further noted that "the appropriate standard of care for judging the reasonableness of the university's actions remains an open question, which the parties are free to litigate on remand." (*Ibid* [emphasis omitted].)[8]

---

[8] The Court declined to review the unanimous portion of our opinion finding that defendant Nicole Green was entitled to

12

## DISCUSSION

On remand, we address the three issues identified by the Supreme Court for our resolution. First, we must determine the standard of care that governs a university's duty to protect its students from foreseeable acts of violence. Second, we must assess whether the defendants have demonstrated as a matter of law that they did not breach their duty. Third, we must decide whether the defendants are immune from Rosen's negligence claim.[9]

### A. Summary of the Duty Established in <u>Regents</u>

Before addressing the issues on remand, we clarify the elements of the duty that the Court announced in *Regents*. As articulated by the Court, colleges and universities have a "duty to protect their students from foreseeable acts of violence in the classroom or during curricular activities."[10] (*Regents, supra,* 4

---

judgment under Civil Code section 43.92. (*Regents*, *supra*, 4 Cal.5th at pp. 634-635.)

[9] After the Supreme Court issued its decision, we invited the parties to submit supplemental briefing on each of these issues. We also held additional oral argument addressing these questions.

[10] Throughout *Regents*, the Court uses varying language to describe the duty that colleges and universities owe to their students. (Compare *Regents*, *supra*, 4 Cal.5th at pp. 613, 618-619, 627, 633, 634 ["universities have . . . a duty to protect [their students] from foreseeable violence during curricular activities"; "universities . . . have a . . . duty. . . to protect or warn their students from foreseeable violence in the classroom or during curricular activities"; "colleges generally owe a duty to use

13

Cal.5th at p. 627.) The Court's analysis in *Regents* indicates a plaintiff must prove three elements to establish breach of this duty. First, the plaintiff must demonstrate the injury occurred while "engaged in activities that are part of the school's curriculum or closely related to its delivery of educational services." (*Regents, supra,* 4 Cal.5th at p. 627; *id.* at p. 630 [the duty "extends to activities that are tied to the school's curriculum but not to student behavior over which the university has no significant degree of control"].) In this case, the Court has already determined that Rosen was injured while participating in a curricular activity (attending a chemistry laboratory). (*Id.* at p. 627 ["the classroom is the quintessential setting for curricular activities. . . . [C]olleges can be expected to retain a measure of control over the classroom environment"].)

Second, the plaintiff must show the university was aware of information that placed, or should have placed, it on notice that the perpetrator presented a foreseeable threat of violence to other students. (See *Regents, supra,* 4 Cal.5th at pp. 631, 633, 634 ["the school's duty is to take *reasonable* steps to protect students when it becomes aware of a *foreseeable* threat to their safety" [emphasis in original]; "[universities] have a duty to act with reasonable care when aware of a foreseeable threat of violence in

---

reasonable care to protect their students from foreseeable acts of violence in the classroom or during curricular activities"; "the school's duty is to take *reasonable* steps to protect students when it becomes aware of a *foreseeable* threat to their safety"; "Colleges. . . have a duty to act with reasonable care when aware of a foreseeable threat of violence in a curricular setting"].) For purposes of clarity and consistency, we hereafter refer to the duty established in *Regents* as the "duty to protect students from foreseeable acts of violence."

14

a curricular setting"; "When circumstances put a school on notice that a student is at risk to commit violence against other students, the school's failure to take appropriate steps to warn or protect foreseeable victims can be causally connected to injuries the victims suffer as a result of that violence"].) As stated by the Court, "[w]hether a university was, or should have been, on notice that a particular student posed a foreseeable risk of violence is a case-specific question, to be examined in light of all the surrounding circumstances." (*Id.* at p. 630; see also *ibid.* ["case-specific foreseeability questions are relevant in determining . . . breach in a particular case"].)

Based on the Court's analysis, the question of foreseeability requires the trier of fact to make two separate factual determinations.[11] First, it must determine what information the university knew about the student in question. Second, it must determine whether, based on that information, it was foreseeable that the student posed a threat of violence. The factors a jury may consider when assessing whether a particular student presented a foreseeable threat of violence include, but are not limited to, "prior threats or acts of violence by the [perpetrator], particularly if targeted at an identifiable victim"; "the opinions of examining mental health professionals"; and "the observations of students, faculty, family members, and others in the university community." (*Regents, supra,* 4 Cal.5th at p. 630.)

_____

11      In the context of negligence, whether an injury was foreseeable in a particular case is "[o]rdinarily[] . . . a question of fact for the jury." (*Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 56 (*Bigbee*); see also *Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, 46 ["While duty is a question of law, foreseeability is a question of fact for the jury"].)

15

Third, the plaintiff must establish that the university failed to act with reasonable care in response to the foreseeable threat of violence. "What constitutes reasonable care will vary with the circumstances of each case." (*Regents, supra,* 4 Cal.5th at p. 632; see also *id.* at p. 633 ["The reasonableness of a school's actions in response to a potential threat is a question of breach"].)

### B. Standard of Care

Although *Regents* held that colleges and universities owe a duty to protect their students from foreseeable acts of violence, the Court left open "the appropriate standard of care for judging the reasonableness of the university's actions," and invited the parties to litigate that issue on remand. (See *Regents, supra,* 4 Cal.5th at p. 634.)

"'Once the existence of a legal duty is found, it is the further function of the court to determine and formulate the standard of conduct to which the duty requires the defendant to conform.' [Citation.] ¶ The formulation of the standard of care is a question of law for the court. [Citations.] Once the court has formulated the standard, its application to the facts of the case is a task for the trier of fact if reasonable minds might differ as to whether the defendant's conduct has conformed to the standard. [Citations.]" (*Ramirez v. Plough, Inc.* (1993) 6 Cal.4th 539, 546 (*Plough*).)

#### 1. The parties' proposed standards of care

In their supplemental briefing, the parties propose widely-divergent standards of care. Rosen asserts we should adopt the standard of care that ordinarily applies in negligence cases, "that of a reasonably prudent person under like circumstances." (*Plough, supra,* 6 Cal.4th at p. 546 ["In most cases, courts have

16

fixed no standard of care for tort liability more precise than that of a reasonably prudent person under like circumstances"].)

Defendants, however, argue that "the standard of care . . . should be that codified in Civil Code section 43.92, i.e., [¶] . . . [¶] limited to those situations where the defendant is aware that a student has communicated a serious threat of physical violence against a reasonably identifiable victim or victims, and believes the threat to be credible." The statute defendants reference precludes liability against a particular class of persons, psychotherapists, for "failing to protect" potential victims from a patient's violent behavior except when "the patient has communicated to the psychotherapist a serious threat of physical violence against a reasonably identifiable victim or victims." (Civil Code, § 43.92, subd. (a); see *also Ewing v. Goldstein* (2004) 120 Cal.App.4th 807, 812 (*Ewing*).[12]

The Legislature enacted section 43.92 in response to *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425 (*Tarasoff*) and *Hedlund v. Superior Court* (1983) 34 Cal.3d 695, which held that a therapist has a duty "to use reasonable care to protect [a potential victim when he or she] determine[s], or under applicable professional standards reasonably should have determined, that a patient poses a serious danger of violence to others." (*Tarasoff, supra*, 17 Cal.3d p. 431.)[13] The

---

[12] Section 43.92, subdivision (b) clarifies that a therapist may "discharge[] his or her duty to protect by making reasonable efforts to communicate the threat to the victim or victims and to a law enforcement agency."

[13] Although described as a "duty to protect," *Tarasoff's* analysis makes clear that a therapist can normally discharge his or her duty by warning the threatened victim. (*Tarasoff, supra*, 17 Cal.3d 425, 539-440.) As noted above (see *ante*, fn. 7), in this

legislative history clarifies that section 43.92 "was not intended to overrule *Tarasoff* or *Hedlund*," but rather to "abolish" those decisions' "expansive rulings . . . that a therapist can be held liable for the mere failure to predict and warn of potential violence by his patient.'" (*Ewing, supra*, 120 Cal.App.4th at p. 816.) The statute represents "a legislative effort to strike an appropriate balance between conflicting policy interests. On the one hand, the need to preserve a patient confidence recognizes that effective diagnosis and treatment of a mental illness or an emotional problem is severely undermined when a patient cannot be assured that a statement made in the privacy of his therapist's office will not be revealed. On the other hand is the recognition that, under limited circumstances, preserving a confidence is less important than protecting the safety of someone whom the patient intends to harm." (*Ibid*.)

Defendants argue the standard of care governing a university's duty to protect its students from foreseeable acts of violence should mirror the limitations set forth in section 43.92 because it would be illogical "to impose a less protective standard of care on lay [school personnel] who don't possess the same training and experience as [a psychotherapist]." Defendants further contend that universities normally rely on their "mental health professionals' assessment of the potential threat posed by the student," and therefore should be held to the same standard as those professionals. Finally, defendants contend that adopting the ordinary standard of care will result in "lay [school personnel]

_____

case, the Supreme Court similarly concluded that a university may, "in an appropriate case" (*Regents, supra*, 4 Cal.5th at p. 619, fn. 2), discharge its duty to protect by conveying a warning to the students at risk.

18

erring on the side of caution and compromising both medical information and other privacy interests by warning students about classmates who act odd or excluding troublesome students."

### 2. *The duty is governed by the ordinary standard of care*

We agree with Rosen that a university's duty to protect students from foreseeable acts of violence is governed by the ordinary negligence standard of care, namely "that degree of care which people of ordinarily prudent behavior could be reasonably expected to exercise under the circumstances." (*Warner v. Santa Catalina Island Co.* (1955) 44 Cal.2d 310, 317 [defining the "ordinary" standard of care]; see also *People v. Superior Court (Sokolich)* (2016) 248 Cal.App.4th 434, 447 ["The general standard of care applicable to negligence is "that of a reasonably prudent person under like circumstances" [citation], which constitutes an 'objective reasonable person standard"].) Although we recognize that "in particular situations a more specific standard [of care] may be established by judicial decision" (*Kentucky Fried Chicken of Cal., Inc. v. Superior Court* (1997) 14 Cal.4th 814, 824), there are several reasons we reject defendants request that we do so here.

First, although *Regents* declined to formulate the standard of care, the Court's analysis of the duty a university owes to its students is more consistent with the ordinary reasonable person standard than the narrowly-drawn standard defendants have proposed. The Court's opinion repeatedly states that the duty requires colleges and universities to use "reasonable care" to protect their students, emphasizing that "[r]easonable care will vary under the circumstances of each case." (*Regents, supra,* 4 Cal.5th at p. 632; see also *id.* at p. 634 ["the reasonableness of a

19

school's actions in response to a potential threat is a question of breach"].)  Moreover, the opinion contains no language suggesting a university can be held liable only when the evidence shows the perpetrator previously made an actual threat of harm against an identifiable victim.

Second, the Supreme Court has previously held that the standard of care that governs a secondary school's duty to protect its students from foreseeable acts of violence is the ordinary reasonable person standard.  In *C.A. v. William S. Hart Union High School District* (2012) 53 Cal.4th 861 (*Hart*), which *Regents* discusses with approval (see *Regents, supra,* 4 Cal.5th at p. 624), the Court affirmed prior holdings recognizing that a school district and its employees "have a duty to use reasonable measures to protect students from foreseeable injury at the hands of third parties acting negligently or intentionally."  (*Hart, supra,* 53 Cal.4th at p. 870.)  The Court further held that the "standard of care imposed upon school personnel in carrying out this duty . . . is identical to that required in the performance of their other duties.  This uniform standard to which they are held is that degree of care 'which a person of ordinary prudence, charged with [comparable] duties, would exercise under the same circumstances.'"  (*Id.* at p. 869; see also *Hemady v. Long Beach Unified School Dist.* (2006) 143 Cal.App.4th 566, 570 ["the California Supreme Court has applied the prudent person standard of care to determine liability of school districts and their employees for injuries to students"].)

Defendants have provided no explanation why the ordinary standard of care that governs the duty secondary schools owe to their students should not also govern the analogous duty universities owe to their students in the curricular setting.  The

20

policy arguments defendants have raised in support of their more specific standard of care—that lay school personnel should not be held to a broader standard of care in anticipating potentially violent students than the school district's psychotherapists and protecting the medical information of medically ill students— apply equally in the context of secondary schools.  The Supreme Court, however, has nonetheless concluded the ordinary standard of care is appropriate.[14]

---

[14]     In her supplemental briefing, Rosen states that *Regents* intended to extend university students the same protections that are enjoyed by "their K-12 counterparts."  We agree that under the holding in *Regents*, universities and secondary schools have a similar duty to protect their students from foreseeable acts of violence.  However, to the extent Rosen is suggesting that universities owe their students the same level of care in supervising and controlling potentially violent students as secondary schools, we reject that proposition.  As *Regents* noted, the Restatement Third of Torts specifically clarifies that the amount of care a school is required to provide "varies in different school environments, with substantially different supervision being appropriate in elementary schools as opposed to colleges." (*Regents*, *supra*, 4 Cal.5th at p. 620 [citing Rest.3d, § 40, com. l, p. 45].)  Moreover, a university's duty to protect its students is limited to curricular activities, and does not extend to student activities that are beyond the institution's control.  Given the greater degree of control secondary schools exert over their students in comparison to universities (compare *Hart*, *supra*, 53 Cal.4th at p. 869 [secondary schools exert "comprehensive control" over their students] with *Regents*, *supra*, 4 Cal.5th at p. 624-627 [colleges provide their students "structure, guidance, and a safe learning environment"]), we conclude the degree of care required by the two types of schools may vary.

Third, other state courts that have addressed the issue, including those cited and discussed in *Regents*, have concluded (either expressly or impliedly) that a university's duty to protect its students from foreseeable violence is governed by the ordinary reasonable person standard. In *Mullins, supra,* 389 Mass. 47, for example, the Massachusetts Supreme Judicial Court affirmed a jury verdict against a college, concluding that there was sufficient evidence to support a finding "that reasonable persons in the position of the defendants would have [taken extra safety precautions to protect students]." (*Id*. at p. 61.)[15] In *Nova, supra,* 758 So.2d 86, the Florida Supreme Court explained that a university's duty to protect students from foreseeable threats of harm requires it to "act[] as a reasonably prudent person would in like or similar circumstances." (*Id*. at p. 90.) Likewise, in *Furek, supra,* 594 A.2d 506, the Delaware Supreme Court repeatedly emphasized that the university's duty to protect from foreseeable harm is assessed under the "reasonable care" standard. (*Id*. at p. 519.)

---

[15] *Mullins* held that colleges have a duty to protect their students from foreseeable "criminal acts of third parties." (*Mullins, supra,* 389 Mass. at pp. 54-55). Recently, in *Nguyen v. Massachusetts Institute of Technology* (2018) 479 Mass. 436 (*Nguyen*), the Massachusetts Supreme Judicial Court held that colleges also have duty to protect their students from self-harm, but clarified that the duty is "limited" to circumstances "[w]here the university has actual knowledge of a student's suicide attempt that occurred while enrolled at the university or recently before matriculation, or of a student's stated plans or intentions to commit suicide." (*Id*. at p. 453.) *Nguyen*, however, contains no language suggesting the court intended to similarly limit the duty set forth in *Mullins*, which is cited approvingly throughout the *Nguyen* decision.

Finally, we note that although presented as an alternative standard of care, UCLA's proposed limitations on when a university may be held liable for failing to protect students from foreseeable acts of violence would effectively operate to narrow the scope of the duty that *Regents* announced. As explained above, *Regents* held that colleges and universities have a duty to act "when aware of a foreseeable threat of violence in a curricular setting." (*Regents*, *supra*, 4 Cal.5th at p. 634.) Under defendants' theory, however, a college or university would only be liable if it had knowledge of an actual threat of harm against an identifiable victim. In effect, defendants appear to assert that foreseeability is present only when such a threat has been made.

If the Court had intended to limit foreseeability in the manner defendants propose, it would have stated as much in its decision. Instead, the Court's decision emphasizes that foreseeability "is a case-specific question, to be examined in light of all the surrounding circumstances." (*Regents, supra,* 4 Cal.5th at p. 630.) Although the Court identified any "prior threats . . . by [the perpetrator], particularly if targeted at an identifiable victim" (*ibid*.), as one factor the jury may consider when assessing foreseeability, *Regents* contains no language suggesting that foreseeability is dependent on the existence of an actual threat of harm made against an identifiable victim.

We are not unsympathetic to the policy arguments the defendants have raised in support of their proposed standard of care. Defendants may be correct, for example, that imposing an ordinary standard of care might cause some school administrators to err on the side of caution, and take actions against mentally-ill students who exhibit conduct that is merely abnormal, rather than potentially violent. We also acknowledge

23

that applying the ordinary standard of care may expose lay school personnel to broader liability than university psychotherapists who treat mentally-ill students. We believe, however, that the Legislature is better-suited to address those policy concerns. If the Legislature concludes that imposing the ordinary standard of care on universities and their employees will lead to undesirable consequences, it can pass a statute limiting the circumstances under which liability may attach, just as it did in passing Civil Code section 43.92. However, we find nothing in *Regents* or any other source of law that supports the judicial creation of a more specialized standard of care.[16]

### C. Triable Issues of Material Fact Exist as to Whether Defendants Breached their Duty of Care

In their petition for writ of mandate, defendants argued that even if they had a duty to respond to foreseeable threats of violence, "[t]he undisputed evidence establishes that [they] acted reasonably as a matter of law and cannot be held liable."

---

[16] The specific amount of care a university is required to provide in a particular case, and the determination whether a university complied with that requirement, are generally questions of fact for the jury to resolve. (See *Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 997 ["as a general proposition one 'is required to exercise the care that a person of ordinary prudence would exercise under the circumstances.' [Citations.] Because application of this principle is inherently situational, the amount of care deemed reasonable in any particular case will vary, while at the same time the standard of conduct itself remains constant, i.e., due care commensurate with the risk posed by the conduct taking into consideration all relevant circumstances. [Citations.] '"There are no 'degrees' of care, as a matter of law; there are only different amounts of care, as a matter of fact. . . ." [Citation.]' [Citation.]"].)

According to defendants, "[t]he most the evidence remotely establishes is that Thompson was a mentally-ill student who once, months earlier, engaged in a dormitory noise-related pushing match with another student . . . and who frequently complained about other students (sometimes including Rosen) without ever threatening serious physical harm and specifically disavowed such an intent. . . ." Defendants assert that under such circumstances, no rational jury could conclude that Thompson presented a foreseeable risk of harm, or that the university could have reasonably done anything more to prevent the attack that occurred.

### 1. *Standard of review*

A motion for summary judgment may be granted only when no "triable issue of one or more material facts" remains for trial. (Code Civ. Proc., § 437c, subd. (o) (1) & (2).) A triable issue of material fact exists where "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' [Citation.]" (*Jade Fashion & Co., Inc. v. Harkham Industries, Inc.* (2014) 229 Cal.App.4th 635, 643.)

"We review an order granting or denying summary adjudication de novo. [Citation.] In our review, we 'liberally constru[e] the evidence in support of the party opposing summary judgment and resolv[e] doubts concerning the evidence in favor of that party. [Citation.]' [Citation.]" (*City of Pasadena v. Superior Court* (2014) 228 Cal.App.4th 1228, 1233.)

## 2. *Summary of the evidence*

### a. *Summary of events preceding Thompson's attack on Rosen*

The parties' evidence shows that shortly after arriving on campus in the fall of 2008, Thompson complained to his history professor that other students had made offensive remarks toward him during an examination, and that he was "outraged" because he believed it had affected his performance. (See *Regents*, *supra*, 4 Cal.5th at p. 614.) In January of 2009, Thompson wrote the Dean of Students, Robert Naples, a three-page letter complaining that students in his dormitory had been harassing him, making unwanted sexual advances and spreading false rumors about him. Thompson warned Maples that if the university failed to discipline the responsible parties, the matter would likely "'escalate into a more serious situation,'" and that he would "'end up acting in a manner that will incur undesirable consequences.'" (*Ibid*.) Shortly after writing the letter, Thompson was transferred to a new dormitory.

Weeks later, Thompson sent emails to three professors and a teaching assistant complaining that other students had made offensive remarks about him, and were trying to distract him from his work. The teaching assistant informed her supervising professor that she had never heard any student insult Thompson. She also reported that Thompson frequently talked to himself, and appeared unstable. She expressed concern that his behavior was symptomatic of schizophrenia. The professor informed Assistant Dean of Students Cary Porter about Thompson's behavior. Porter then contacted UCLA's "Consultation and Response Team" (the Response Team), which was responsible for providing advice and consultation to campus members who had concerns about the well-being of students. Porter also met with

26

Thompson and encouraged him to seek medical help at UCLA's Counseling and Psychological Services (CAPS). Thompson declined. (See *Regents*, *supra*, 4 Cal.5th at p. 614.)

In February of 2009, Thompson informed the resident director of his dormitory that he heard "'voices coming through the walls calling him an idiot,'" and "believed the other residents were planning to shoot him." (*Regents*, *supra*, 4 Cal.5th at p. 614.) Thompson also told the director he had called his father to report what had occurred, and that his father had advised him to "'hurt the other residents.'" (*Ibid.*) Thompson said he had "thought about it," but decided he "wasn't going to do anything." (*Ibid.*) The director contacted campus police, who transported Thompson to a hospital for a psychiatric evaluation.

During the examination, Thompson complained of "auditory hallucinations and paranoid thinking," explaining that he "heard people talking about him and insulting him, even when "'there's no one there.'"" (*Regents*, *supra*, 4 Cal.5th at p. 615.) The medical examiners diagnosed Thompson with "possible schizophrenia and major depressive disorder." Although Thompson rejected voluntary hospitalization, he agreed to start attending outpatient treatment at CAPS. (*Ibid.*) The resident director informed Cary Porter and the Response Team about the dormitory incident, and Thompson's subsequent mental evaluation.

At his CAPS sessions, which began in March of 2009, Thompson informed university psychologist Nicole Green he was frustrated that nobody believed he was hearing voices, and stated that he would try to record what he was hearing. Thompson also reported that he continued to feel harassed by other students in his dormitory, which made him angry. Green diagnosed

27

Thompson with schizophrenia, but concluded that he did not exhibit suicidal or homicidal ideation, and had not expressed any present intent to harm others. Thompson also met with CAPS psychiatrist Charles McDaniel. Thompson admitted to McDaniel that he had previously experienced "general ideations about harming others," but clarified that he had never formulated an actual plan, or identified a specific victim. (*Regents*, *supra*, 4 Cal.5th at p. 615.) McDaniel recommended that Thompson voluntarily hospitalize himself, but Thompson declined. In April, Thompson informed Green he had stopped taking his psychotropic medication. He stopped attending his CAPS sessions shortly thereafter.

In June of 2009, Thompson was involved in an altercation in his dormitory. According to the campus police report, Thompson had knocked on the door of a sleeping resident, accused the resident of making too much noise and then pushed him in the chest. When the resident told Thompson he had not been making any noise, Thompson pushed him again, and threatened that this was his "last warning." (*Regents*, *supra*, 4 Cal.5th at p. 615.) As a result of the incident, Thompson was expelled from university housing, and ordered to return to CAPS when the fall semester began.

During the remainder of the summer semester, Thompson complained to two faculty members about insults and harassment from other students in his chemistry laboratory. At the beginning of the fall quarter, Thompson informed his chemistry professor, Alfred Bacher, that other students were engaged in disruptive behavior that was interfering with his experiments.

The next day, September 30, Thompson told CAPS psychologist Tanya Brown that he still "occasionally" heard "voices of other students having 'malice' toward him and making critical and racist comments." (*Regents*, *supra*, 4 Cal.5th at p. 616.) Thompson, however, denied any intent to harm anyone, including those who had criticized him. Brown noted that Thompson displayed slowed speech, delusional thought processes and impaired insight. McDaniel met with Thompson the same day and made similar observations about his appearance and thought process. Thompson agreed to begin receiving treatment at the university's behavioral health clinic.

On October 6, two days before the attack, Thompson told his chemistry teaching assistant, Adam Goetz, that students in the laboratory were calling him stupid. Goetz, who had not heard anyone insult Thompson, informed Professor Bacher about Thompson's behavior, and expressed concern that his outbursts were becoming a weekly "routine." Goetz later testified that Thompson frequently identified Rosen as one of the students who called him stupid. A second teaching assistant informed Professor Bacher that Thompson had come into his chemistry lab from a different section, and accused students of verbally harassing him. The teaching assistant had not witnessed any harassment, and was skeptical of Thompson's claims.

On October 7, Professor Bacher contacted Dean Porter and sought advice on how to proceed. Porter emailed Karen Minero, a member of the Response Team, who then forwarded the email to other members of the Response Team and to CAPS personnel. On the morning of October 8, Porter and Minero discussed Thompson, and decided to investigate whether he was having similar difficulties in other classes.

29

Later that afternoon, Thompson was working in Professor Bachman's chemistry laboratory when, without warning or provocation, he stabbed Rosen in the chest and neck with a kitchen knife.  When campus police arrived, Thompson admitted he had stabbed someone and explained that the other students had been teasing him.

### b. *Summary of Rosen's expert witness declarations*

In support of her opposition to the defendants' motion for summary judgment, Rosen provided declarations from two expert witnesses who concluded that Thompson's behavior prior to the attack clearly demonstrated that he "posed a threat" to other students.  The experts further concluded that under UCLA's own policies and procedures, the Response Team or other school personnel with knowledge of Thompson's situation should have referred him to the university's "Violence Prevention and Response Team" (the Violence Prevention Team), a group of specialists trained to assess threats and prevent campus violence. According to the experts, had the Violence Prevention Team been notified about Thompson, it could have "gathered and analyzed all of the information and conducted a proper threat assessment." As explained by one of Rosen's experts, "Although the Response Team was an appropriate team to assess and care for [Thompson] as a troubled student in distress, [the Violence Prevention Team] should have been involved as soon as it became clear that [he] both posed and uttered threats against others, and certainly after any type of violent behavior was exhibited.  When [Thompson] engaged in violent, threatening, and disruptive behavior at his residence hall on June 3, 2009, he should been placed on the agenda for a meeting held by the [Violence Prevention Team]. The [Violence Prevention Team], in turn, should have

recommended interventions that would have mitigated the threat posed by [Thompson]."

The expert witnesses further concluded that UCLA's failure to "perform any type of threat assessment or implement any type of violence prevention measure in response to a distressed student who was continuously and consistently obstructive and disruptive because of his paranoid behavior and who threatened the health and safety of others" was contrary to its own polices, and violated "the standard applicable to university campuses."

### 3. *There is a triable issue of fact whether defendants breached their duty of care*

Defendants argue that the evidence conclusively negates two factual determinations that Rosen must prove to establish the university breached its duty of care. First, they contend the evidence shows university personnel could not have foreseen that Thompson posed a threat to his fellow students. Second, they assert that even if a rational jury could find the university was aware of facts demonstrating that Thompson presented a foreseeable threat of harm, the evidence nonetheless shows the university exercised reasonable care in attempting to respond to that threat.

Foreseeability of harm and breach of the standard of care are ordinarily questions of fact for the jury's determination. (See *Brummett v. County of Sacramento* (1978) 21 Cal.3d 880, 887 ["[d]ue care as an element of negligence presents a question of fact for the jury"]; *Bigbee, supra,* 34 Cal.3d at p. 56 ["Ordinarily, foreseeability [in negligence cases] is a question of fact for the jury"].) The issues can be resolved on summary judgment "only if, 'under the undisputed facts there is no room for a reasonable difference of opinion.' [Citation.]" (*Bigbee, supra,* 34 Cal.3d at p.

31

56 [addressing foreseeability]; see also *T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 188 ["the question of breach can be decided as a matter of law where 'no reasonable jury could find the defendant failed to act with reasonable prudence under the circumstances'"]; *Sprecher v. Adamson Companies* (1981) 30 Cal.3d 358, 373 [summary judgment improper unless "the evidence . . . conclusively establish[es] that no rational inference of negligence can be drawn under the circumstances of this case"].)

Based on the evidence summarized above, a reasonable jury could find the university was aware of information demonstrating that Thompson posed a foreseeable risk of violence. The record contains extensive evidence that university personnel were aware Thompson had been continuously experiencing auditory hallucinations and paranoid delusions, all of which involved perceived harassment and insults by other students. On one occasion, Thompson's hallucinations caused him to believe residents in his dormitory were plotting to shoot him. On a second occasion, the hallucinations caused Thompson to repeatedly push another student, resulting in Thompson's expulsion from campus housing. Although Thompson consistently denied any present intent to harm himself or others, he told multiple UCLA employees that he had previously experienced general thoughts about harming the people who were harassing him. Moreover, he repeatedly warned school administrators that if the insults and harassing behavior did not stop, he would be forced to take matters into his own hands. Finally, both of Rosen's experts concluded that Thompson's continuous, erratic behavior demonstrated that he presented a foreseeable threat to his co-students. Considered together, this

32

evidence is sufficient to support a rational inference that the university should have foreseen Thompson posed a threat.

We likewise conclude there is a triable issue of fact whether the university acted reasonably in response to the threat Thompson posed. In particular, as the dissent noted in our prior decision, the evidence suggests there may have been an unreasonable failure of communication and lack of coordination among the various professional teams responsible for responding to situations of the type presented by Thompson. Both of Rosen's experts concluded that university personnel should have referred Thompson to the Violence Prevention Team, which could have then conducted a formal threat assessment and recommended interventions that would have mitigated the threat he posed to students. The defendants have presented no argument explaining why no rational juror could find that the university's failure to involve the Violence Prevention Team at any time during Thompson's extended period of erratic behavior was unreasonable.[17]

---

**17** In their petition for writ of mandate and supplemental briefing, defendants argue that Rosen's expert declarations do not qualify as "competent" evidence, and therefore should not be considered, because neither declaration "reference[s] or acknowledge[s] the California legal standards that govern duty and liability." The defendants' briefs, however, do not include any legal analysis explaining why the experts were required to discuss California law, nor have the defendants cited any legal authority in support of their position. We therefore deem the argument waived. (See *People v. Hovarter* (2008) 44 Cal.4th 983, 1029 ["""[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration"""]; *Akins v. State* (1998) 61 Cal.App.4th 1,

Defendants may ultimately persuade the finder of fact that Thompson's conduct was unforeseeable, or that university employees exercised reasonable care under the circumstances. However, this is not one of those exceptional cases where the question of negligence is properly decided by the court as a matter of law.

### D. The Regents Is Not Statutorily Immune from Suit

Defendants assert that even if they owed Rosen a duty of care and there are triable issues of fact regarding the breach of that duty, they are nonetheless entitled to summary judgment on immunity grounds pursuant to Government Code sections 856 and 820.2, and Civil Code section 43.92. Although the majority did not address this issue in the prior opinion because it found there was no duty, the dissent rejected it, concluding that while these statutes shield certain aspects of this tragic situation from liability, they do not, either singly or in combination, justify denying Rosen the right to present her negligence claim to a jury. The panel now unanimously agrees with that conclusion.

#### 1. Rosen's claim is not barred under Government Code section 856

Government Code section 856, subdivision (a) provides, in relevant part: "Neither a public entity nor a public employee acting within the scope of his employment is liable for any injury resulting from determining in accordance with any applicable enactment: [¶] (1) Whether to confine a person for mental illness

---

50 ["The contention is waived by failure to cite any legal authority"]; *Hess Collection Winery v. Agricultural Labor Relations Bd.* (2006) 140 Cal.App.4th 1584, 1607, fn. 6 [argument is waived for failure to cite any supporting authority].)

or addiction."  The statute thus precludes any claim against the university or its personnel for failing to seek or obtain Thompson's confinement.  (*Tarasoff, supra*, 17 Cal.3d at p. 450 [section 856 immunizes claims "base[d] [on the] . . . fail[ure] to procure [an individual's] confinement"].)

Rosen's negligence claim, however, does not challenge any university decision regarding Thompson's confinement.  Instead, she seeks to impose liability based on other allegedly negligent behavior the university engaged in with respect to Thompson, including the failure to refer Thompson to the Violence Prevention Team, or to employ many of the other intervention techniques that were available to the school under its existing policies and procedures.  This alleged conduct falls outside the scope of section 856's immunity provision.

> ### 2. *Defendants' alleged misconduct was not the result of an act of discretion within the meaning of Government Code section 820.2*

The defendants also argue the university and its employees are immune from Rosen's claim pursuant to Government Code sections 820.2 and 815.2.  Section 820.2 provides:  "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."  Government Code section 815.2, subdivision (b), extends that discretionary act immunity to the public entity whose employee's conduct is at issue:  "Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability."

35

The Supreme Court has interpreted section 820.2 to "allow[] immunity for basic policy decisions" by government officials, but not for "the ministerial implementation of that basic policy." (*Johnson v. State of California* (1968) 69 Cal.2d 782, 796 (*Johnson*).) In *Johnson,* the Court characterized this "distinction" as being "between the 'planning' and 'operational' levels of decision-making." (*Id*. at p. 794.) "There is no basis for immunizing lower level decisions that merely implement a basic policy already formulated. [Citation.] The scope of the discretionary act immunity 'should be no greater than is required to give legislative and executive policymakers sufficient breathing space in which to perform their vital policymaking functions.'" (*Barner v. Leeds* (2000) 24 Cal.4th 676, 685 (*Barner*).)

In *Barner, supra*, 24 Cal.4th 676, which guides our analysis here, the Court held that section 820.2 did not immunize a public defender's decisions made during the "representation of a defendant in a criminal action." (*Id*. at p. 679.) In its analysis, the Court explained that while public defenders "must exercise considerable judgment in making decisions regarding the type and extent of services necessary to discharge his or her duty of care to clients" (*id*. at p. 688), those decisions do "not involve discretionary acts within the meaning of section 820.2 (i.e., policy or planning decisions)." (*Ibid*.) The Court further explained that while "the initial determination whether to provide representation to a certain class of individuals or to represent a particular defendant" might qualify as a "policy decision" (*ibid*.) the subsequent provision of such services to an individual client "consist[s] of operational duties that merely implement the initial

36

decision to provide representation and are incident to the normal functions of the office of the public defender." (*Ibid*.)

Under the analysis set forth in *Barner*, a university's decision to create specific programs and protocols to identify and respond to threats of violence on campus would appear to qualify as a planning or policy determination, and thus "discretionary" within the meaning of section 820.2. Rosen's claim, however, does not challenge the adequacy of the university's safety programs or protocols. Instead, she challenges the manner in which the university and its employees executed those programs with respect to an individual student who Rosen alleges presented a foreseeable threat of harm.[18] These alleged acts and omissions constitute "subsequent ministerial actions in the implementation of the basic decision" (*Johnson*, *supra*, 69 Cal.2d at p. 797) to adopt measures to maintain a safe campus. Even though the UCLA officials involved in this matter may have exercised highly skilled, professional judgment in making choices among complex alternatives in their responses to the situation presented by Thompson, Government Code section 820.2 does not bar Rosen's negligence claim.

---

[18] In her return to the petition for writ of mandate, Rosen specifically acknowledges that UCLA's "policies and procedures" were adequate. She claims, however, that "UCLA personnel charged with executing these procedures failed" to properly do so. Her expert declarations likewise acknowledge that UCLA's policies and procedures were adequate to identify and address potential threats of violence. The expert witnesses claim, however, that UCLA personnel failed to "comply with [these] policies and procedures" by, among other things, failing to refer Thompson to the Violence Prevention Team.

### 3. *Defendant Nicole Green is entitled to dismissal of Rosen's claims under Civil Code section 43.92*

In our prior decision, we unanimously concluded that defendant Nicole Green, a UCLA psychologist who treated Thompson, was entitled to judgment pursuant to Civil Code section 43.92 because there was no evidence that Thompson had ever communicated to Green a serious threat of violence against Rosen. In *Regents*, the Supreme Court "decline[d] . . . to revisit [that] ruling," noting that "Rosen's petition for review was limited to the issue of duty." (*Regents, supra*, 4 Cal.5th at p. 634.)

We reaffirm our prior finding that Green is entitled to judgment pursuant to Civil Code section 43.92. We further conclude, however, that her removal from the case does not preclude liability against the Regents if the negligence of other university employees is demonstrated.[19]

---

**19** Rosen's supplemental brief includes a request that we award her attorney's fees pursuant to Code of Civil Procedure section 1021.5. We deny the request without prejudice to Rosen's right to seek such fees in the trial court.

38

## DISPOSITION

The petition is granted with regard to defendant Nicole Green, and is denied in all other respects. Plaintiff shall recover her costs on the petition.

ZELON, J.

We concur:

PERLUSS, P. J.

SEGAL, J.